ORDERED.

Dated: September 13, 2024

_____
Lori V. Vaughan
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re ) | |
| ) | |
| Legacy Pools LLC, ) | Case No. 6:22-bk-03123-LVV |
| ) | |
| Debtor(s). ) | |

### OPINION SUPPLEMENTING ORDER CONVERTING CASE TO CHAPTER 7

THIS CASE came on for an evidentiary hearing to consider confirmation of the Final Plan of Reorganization (Doc. No. 193)("Plan") filed by Legacy Pools, LLC ("Debtor"), objections to confirmation of the Plan,[1] and Motion to Convert Case to Chapter 7, Dismiss or in the Alternative, Remove Debtor as Debtor-In-Possession (Doc. No. 144) ("Motion to Convert") filed by United States Trustee ("UST"). At the conclusion of the hearing, the Court made oral findings of fact and conclusions of law which denied confirmation of the Plan, converted this case to chapter 7, and entered an Order Converting Case to Chapter 7 (Doc. No. 224) ("Order").[2] The Order provided the Court would supplement the Order with written findings of fact and conclusions of law. These are

---

[1] Doc. Nos. 106, 109,113, 180, 189.
[2] The evidentiary hearing occurred on February 27, 2023 and March 1, 2023.

the Court's written findings and conclusions further explaining the ruling made on March 1, 2023. *See In re Mosley*, 494 F.3d 1320 (11th Cir. 2007).[3]

## Background Facts

Debtor designs and constructs in-ground luxury custom pools and spas in Central Florida. Charles David Black,[4] who is the president and 100% owner of the Debtor, manages the Debtor and supervises all pool design subcontractors employed by Debtor.[5] Mr. Black holds a contractor's license with the Florida Department of Business & Professional Regulation ("Florida DBPR") which allows him, on behalf of the Debtor, to design and build residential pools throughout Florida.[6] Kristin Black, Mr. Black's spouse, is Debtor's vice president. Debtor started operations in the Fall 2018.[7]

Beginning in 2020, Debtor contends the COVID-19 pandemic caused a decrease in demand for pools and combined with supply chain issues and increased material costs, Debtor could no longer pay expenses.[8] Debtor received a $133,000 paycheck program protection loan which was later forgiven, and a $2 million disaster loan from the government.[9] Debtor then began acquiring short-term high interest loans.[10] Still Debtor did not complete work on numerous pools. Customers began complaining on social media and filing complaints with the Florida DBPR regarding Debtor or Mr. Black's inaction.[11] The Florida DBPR received 145 complaints with respect to Mr. Black's license which are pending further investigation or action from the Office of General Counsel.[12]

---

[3] The present tense is used throughout this opinion in order to further explain and supplement an oral ruling made on March 1, 2023, and do not reflect the current circumstances of this case.
[4] Charles David Black is also known as Chad Black.
[5] Debtor Exh. 5; Doc. No. 255, 2/27/23 Trial Tr. p. 81.
[6] Doc. No. 255, 2/27/23 Trial Tr. p. 81.
[7] Debtor Exh. 5.
[8] Debtor Exh. 5; Doc. No. 255, 2/27/23 Trial Tr. pp. 50-52.
[9] Doc. No. 255, 2/27/23 Trial Tr. pp. 53-54.
[10] Doc. No. 255, 2/27/23 Trial Tr. pp. 54-55.
[11] Debtor Exh. 5; Doc. No. 255, 2/27/23 Trial Tr. p. 56
[12] Doc. No. 255, 2/27/23 Trial Tr. pp. 218-219.

Later, the Florida DBPR discovered Mr. Black had not disclosed that prior to obtaining his Florida license his Virginia contractor license had been revoked and a judgment had been entered against him relating to that prior business.[13]

On August 30, 2022, Debtor filed this chapter 11 case, under subchapter V. The UST appointed Robert Altman as subchapter V trustee ("Trustee"). Debtor's schedules listed assets totaling approximately $665,000 while liabilities exceeded $4.6 million, including unsecured amounts owed to an equipment supplier—SCP Distributors ("SCP").[14] Debtor listed over 150 homeowners (collectively "Homeowners") who had paid deposits and contracted with Debtor before bankruptcy to design and build pools that were in various stages of construction.[15] Each homeowner was listed as holding an unsecured claim with "unknown" amounts.[16] The Court entered an Order Prescribing Procedures in Chapter 11 Subchapter V Case, Setting Deadline for Filing Plan, and Setting Status Conference ("Sub V Order") providing Debtor could continue to operate as debtor-in-possession and establishing certain procedures, requirements and deadlines Debtor had to follow during the case.[17]

Debtor filed its Final Plan of Reorganization under subchapter V on February 22, 2023 ("Plan").[18] The Plan designates 16 classes of claims and provides upon confirmation, for the creation of a construction trust ("Construction Trust"). The Construction Trust would consist of Homeowners who elected to pay Debtor additional funds as an "inflation adjustment" that would allow Debtor to complete their pools.[19] If a homeowner elects to participate in the Construction Trust, the homeowner releases pre-petition claims against Debtor, including any distribution rights

---

[13] UST Exhs. 22, 23; Doc. No. 255, 2/27/23 Trial Tr. p. 255.
[14] Doc. No. 23.
[15] *Id.*
[16] *Id.*
[17] Doc. No. 11.
[18] Doc. No. 193; Debtor Exh. 1.
[19] Debtor Exh. 1.

3

under the Plan. The Plan consists of the following classes:

> Class 1: Allowed Secured Claim of Ally Financial (2021 Ford F-150).
> Class 2: Allowed Secured Claim of Ally Financial (2018 Ford F-150).
> Class 3: Allowed Secured Claim of Ascentium Capital, LLC
> Class 3(a): Allowed Secured Claim of Bank of the West.
> Class 4: Allowed Secured Claim of Ford Motor Credit (2018 Ford F-150).
> Class 5: Allowed Secured Claim of Ford Motor Credit (2018 Ford F-150 King).
> Class 6: Allowed Secured Claim of Ford Motor Credit (2017 Nissan Frontier).
> Class 7: Allowed Secured Claim of Ford Motor Credit (2020 Ford).
> Class 8: Allowed Secured Claim of Keystone Equipment Finance Corp.
> Class 9: Allowed Claim of MCA Servicing Company.
> Class 10: Allowed Claim of Samson MCA, LLC.
> Class 11: Allowed Secured Claim of U.S. Bank Equipment Finance (Office Copier).
> Class 12: Allowed Secured Claim of the U.S. Small Business Administration.
> Class 13: Allowed General Unsecured Claims Against Legacy Pools, LLC.
> Class 13(a): Allowed Unsecured Claim of SCP Distributors.
> Class 14: Equity Interests in Legacy Pools, LLC.

Except for Class 14, all classes are impaired. Classes 1 through 12 consist of secured claims and their respective treatments. Class 13 is general unsecured claim holders, including Homeowners electing not to participate in the Construction Trust. Class 13 will receive annual *pro rata* distributions of Debtor's actual disposable income over five (5) years (after administrative claims and priority claims are satisfied in full) and a *pro rata* share of the net proceeds recovered from certain causes of actions. Class 13(a) consists of SCP's allowed unsecured claim totaling $24,402.11 and provides SCP will receive six (6) monthly payments of $4,067.02 beginning 30 days after the effective date until the claim is satisfied in full.

Debtor attaches to the Plan a projection of financial performance for a five-year period ("Projections") and a liquidation analysis ("Liquidation Analysis").[20] The Projections do not show any distributions to Class 13 unsecured creditors. The Liquidation Analysis, however, estimates $500,000 of disposable income payments under the Plan based on new sales and revenue received through the Construction Trust. Because most classes did not accept the Plan, Debtor filed a

motion for cramdown requesting confirmation under 11 U.S.C. § 1191(b).[21]

The Trustee, UST and several Homeowners filed objections to confirmation of the Plan or joinders thereto.[22] Although parties asserted various reasons why the Plan could not be confirmed, two consistent arguments are: (1) the plan is not feasible as required by 11 U.S.C. § 1129(a)(11); and, (2) the plan does not meet the requirements of 11 U.S.C. § 1191(b) to allow confirmation. Shortly after filing its objection, the UST filed the Motion to Convert arguing Debtor filed this case in bad faith, could not propose a confirmable plan and had grossly mismanaged the estate requiring either conversion to chapter 7 or dismissal under 11 U.S.C. § 1112(b), or in the alternative, removal of Debtor as debtor-in-possession under 11 U.S.C. § 1185.[23]

The Court held a two-day evidentiary hearing on confirmation of the Plan and the Motion to Convert.[24] The Court heard testimony from Mr. Black, Ian Brown with the Florida DBPR, and one of the Homeowners—Shalom Einhorn. Having considered the evidence admitted, argument of parties' counsel and for the reasons stated in open court on March 1, 2023 and herein, the Court denies confirmation and will convert the case to chapter 7.

**<u>Confirmation</u>**

Section 1191 of the Bankruptcy Code governs confirmation of a plan under subchapter V, chapter 11.[25] A plan may be confirmed as either consensual under § 1191(a), or as nonconsensual under § 1191(b). To be confirmed, all plans must meet the requirements of § 1129(a)(1)-(7), (9), (11)-(14), and (16). A consensual plan must also satisfy the requirements of §

---

[20] Debtor Exhs. 1, 2, 3.
[21] Doc. No. 218.
[22] Doc. Nos. 106, 109, 113, 180, 189.
[23] Doc. No. 144. UST filed the Motion to Convert on January 19, 2023.
[24] The evidentiary hearing was held on February 27, 2023 and March 1, 2023.
[25] All references to the Bankruptcy Code refer to 11 U.S.C. §§ 101 *et seq*.

1129(a)(8) and (a)(10). If a debtor cannot satisfy the consensual plan requirements, the plan may be confirmed as nonconsensual under § 1191(b), provided "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1191(b). Debtor has the burden to prove by a preponderance of the evidence each element necessary for confirmation. *In re Stein Mart, Inc.*, 629 B.R. 516, 522 (Bankr. M.D. Fla. 2021). Here, Debtor has not met its burden for the elements required under § 1129(a)(3), (a)(11), and the elements required for a nonconsensual plan under § 1191(b).

§ 1129(a)(11)- Feasibility

Section 1129(a)(11) requires the Court to determine that confirmation of the plan of reorganization "is not likely to be followed by the liquidation, or need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This requirement "is designed primarily to prevent confirmation of visionary schemes that promise a greater distribution than the debtor or plan proponent could ever attain." *In re JRV Indus., Inc.*, 344 B.R. 679, 683 (Bankr. M.D. Fla. 2006). "The use of the word, likely, requires the Court to assess whether the plan offers a reasonable 'probability of success, rather than a mere possibility.'" *In re Diplomat Constr., Inc.*, 2009 WL 6498180, at *2 (Bankr. N.D. Ga. Nov. 20, 2009) (quoting *In Kent Terminal Corp.*, 166 B.R. 636, 650 (Bankr. S.D.N.Y. 1994)). That is, the proponent must show the plan offers "a reasonable prospect of success and ... is workable." *In re D & G Invs. of W. Florida, Inc.*, 342 B.R. 882, 885 (Bankr. M.D. Fla. 2006).

Here, Debtor has not proposed a feasible plan. The Plan projects 121 new pool design and construction management sales or contracts within the first year, starting with 5 new contracts

within the first month.[26] Although this case has been pending six months as of confirmation, Debtor has not obtained any post-petition contracts to design or manage pool construction. Debtor provided no credible evidence of future leads for new customers or contracts.[27] Debtor had no reasonable explanation for the sudden increase of contracts. The evidence demonstrates that during this case Debtor merely collected some funds from existing Homeowners who wanted to proceed outside the Construction Trust.[28] Although Debtor asserts to have funds in the Construction Trust that would be used to fund the Plan, Debtor provided no historical information as to deposits, disbursements or the trust account balance to demonstrate feasibility.[29] Nor did Debtor's monthly operating reports ever come close to meeting Debtor's projections.[30] Simply put, Debtor's actual performance during the first six months of this case until confirmation does not support the Plan or Projections. The Plan and Projections are clearly a pipe dream with no reasonable prospect of success.

Further exacerbating feasibility are actions the Florida DBPR may take against Mr. Black, who holds the license allowing Debtor to provide pool contracting services.[31] Florida DBPR has 79 active consumer complaints against Mr. Black, almost all of which the DBPR has abated during this bankruptcy case.[32] These complaints relate to consumer harm Mr. Black caused (through the Debtor) by collecting funds and providing little or no services.[33] Florida DBPR may also pursue Mr. Black for failing to disclose two items on his application to obtain his license—revocation of his

---

[26] Doc. No. 255, 2/27/23 Trial Tr. p. 174. Notably, the design and consulting business is a shift from Debtor's pool construction business. Mr. Black testified that he anticipated 93 pool design sales and 61 pool construction sales for a total of 154 new sales during the first year of projections. The projections attached to the Plan are significantly less, with 72 pool design sales and 49 pool construction sales for a total of 121 new sales during the first year. *See* Debtor Exh. 2.

[27] Except for Mr. Black testifying he had approximately 15 potential pool sales, Debtor provided no other evidence to substantiate Debtor had any potential pool sales or leads. Doc. No. 256, 3/1/23 Trial Tr. 43. Based on Debtor's performance during this case, the Court finds Mr. Black's testimony self-serving and lacking credibility.

[28] Doc. No. 255, 2/27/23 Trial Tr. p. 166.

[29] Debtor did not include the construction trust receipts in the monthly operating reports.

[30] Debtor Exhs. 11,12,13. Debtor projected cash receipts of $292,000 for October 2022, $325,000 for November 2022 and $125,000 for December 2022. Debtor's actual cash receipts were $16,765 for October 2022, $35,100 for November 2022 and $20,000 for December 2022.

[31] Doc. No. 255, 2/27/23 Trial Tr. pp. 195, 199.

[32] Doc. No. 255, 2/27/23 Trial Tr. pp. 193, 201.

Virginia contractor's license in 2010 and a $37,000 unsatisfied judgment entered in 2010.[34] These complaints may result in revocation of Mr. Black's license—diminishing Debtor's ability to obtain new contracts. More than just a possibility, revocation of Mr. Black's license appears likely. Mr. Brown, Chief Construction Attorney for the Florida DBPR since 2015, testified that he told counsel "there was no way in you know what that this guy [Mr. Black] was going to keep his license because of the consumer harm that had been done."[35] Mr. Brown also testified that "I can tell you just historically with the number of complaints like this our board is not going to allow someone to continue with a license with the consumer harm that has been done here."[36] Although Mr. Black will have an opportunity to defend the complaints and possibly keep his license, at a minimum Mr. Black will have less time to obtain new contracts for the Debtor. In either case, Florida DBPR's actions against Mr. Black significantly dimmish Debtor's reasonable prospect of success by obtaining the new contracts as projected. *See In re Abrass*, 268 B.R. 665, 688 (Bankr. M.D. Fla. 2001)(court could only "guess" if debtor, a real estate agent, could make required chapter 13 plan payments until Florida DBPR determined whether debtor could keep her real estate license). The Court finds that Debtor's Plan does not meet the feasibility test under § 1129(a)(11).

§ 1129(a)(3)-Good Faith

Section 1129(a)(3) mandates the Court confirm a plan only if "the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Although "good faith" is not defined in the Bankruptcy Code, courts construe good faith to mean "a reasonable likelihood exists that the plan will achieve a result consistent with the objectives and purposes of the Code." *In*

---

[33] Doc. No. 255, 2/27/23 Trial Tr. p. 240.
[34] UST Exhs. 22, 23; Doc. No. 255, 2/27/23 Trial Tr. p. 255.
[35] Doc. No. 255, 2/27/23 Trial Tr. p. 245.
[36] Doc. No. 255, 2/27/23 Trial Tr. p. 245. Mr. Brown was called as a witness by the Debtor to testify that with a confirmed plan, Debtor would be able to continue operating under Mr. Black's license. Needless to say, Mr. Brown's testimony backfired.

*re McCormick*, 49 F.3d 1524, 1526 (11th Cir. 1995). Courts consider whether the debtor intended to abuse the judicial process and the purposes of reorganization. *In re JRV Industries, Inc.*, 344 B.R. 679, 684 (Bankr. M.D. Fla. 2006). But, the court's focus should be the plan itself, considering the totality of circumstances surrounding the plan, *McCormick*, 49 F.3d at 1526, including postpetition conduct of the debtor or plan proponent. *In re Proud Mary Marina Corp.*, 338 B.R. 114, 126 (Bankr. M.D. Fla. 2006). Failing to disclose relevant information in a bankruptcy case is a sufficient basis for finding a plan had not been proposed in good faith. *In re Proud Mary Marina Corp.*, 338 B.R. 114, 126 (Bankr. M.D. Fla. 2006).

After presiding over a two-day evidentiary hearing, the Court finds that the totality of circumstances demonstrate Debtor did not propose the Plan in good faith. Here, unsecured creditor Class 13, consisting of Homeowners electing not to participate in the Construction Trust, will only be paid *pro rata* distributions of Debtor's *actual* disposable income over five (5) years, with no guarantee of any minimum amount. While another unsecured creditor, SCP in Class 13(a), receives payment in full within months of the effective date. Debtor failed to disclose any financial information as to the Construction Trust which is a significant attribute of the Plan. Debtor, through Mr. Black, misled the UST by testifying he did not have access to QuickBooks to obtain certain requested financial records despite Debtor having access to QuickBooks.[37] Although the Plan contemplates the formation of a litigation committee to prosecute claims against insiders (the Blacks), the litigation committee will be selected by the reorganized Debtor, who will still be controlled by the Blacks. Nor does the Plan address the claims to be prosecuted against insiders even though the evidence presented at the evidentiary hearing clearly demonstrates significant avoidance claims exist against the Blacks.

Before filing this case, Debtor used assets to construct a luxury pool at the Blacks' home while construction of the Homeowners' own pools languished. Debtor failed to disclose such transfer or location of asset—the Black's completed luxury pool—on the Debtor's schedules or statements. Debtor also contributed over $150,000 to Mr. Black's church within two years of the bankruptcy filing.[38] During this case through confirmation, Debtor made no attempts to recover such assets or funds from the Blacks. Instead, Debtor proposed a Plan that either sought more funds from the Homeowners (in addition to the contracted amount) through a Construction Trust to complete their pools or provided Homeowners with a *pro rata* distribution with no guarantee. Furthermore, Mr. Black testified that during this case he was providing *gratis* pool design services for family members.[39] Together such actions lack good faith. Debtor, through Mr. Black's actions throughout this case, is abusing the judicial process and the purposes of reorganization.

<u>11 U.S.C. § 1191(b)- Nonconsensual Plan</u>

Section 1191(b) allows confirmation of a nonconsensual plan if the plan does not discriminate unfairly and is fair and equitable with respect to each impaired class that has not accepted the plan. 11 U.S.C. § 1191(b). The various requirements for a "fair and equitable" nonconsensual plan are established by § 1191(c). 11 U.S.C. § 1191(c). Here, the relevant requirements are:

- the plan provides that all of the debtor's projected disposable income to be received in a three-year period, or such longer period not to exceed five years, will be applied to make payments under the plan.

- the debtor will be able to make all plan payments or there is a reasonable likelihood debtor will be able to make all plan payments and the plan provides

---

[37] Doc. No. 255, 2/27/23 Trial Tr. pp. 119-131. Only after a lengthy parley with counsel for UST who had demonstrated that Debtor had access to QuickBooks at the time in question, did Mr. Black admit that Debtor had access to QuickBooks and halfheartedly apologized for having lied at his deposition.
[38] Doc. No. 23; UST Exh. 15.
[39] Doc. No. 255, 2/27/23 Trial Tr. p. 177.

> appropriate remedies to protect the holder of claims or interests if payments are not made.

The term "disposable income" means the income received by the debtor and that is not reasonably necessary to be expended "for the payment of expenditures necessary for the continuation, preservation or operation" of the debtor's business. 11 U.S.C. § 1191(d)(2).

Debtor has not met the requirements to allow confirmation of a nonconsensual plan. As discussed, Debtor has unfairly discriminated with respect to unsecured creditors in Class 13 and Class 13(a). The Plan does not provide for all of Debtor's *projected* disposable income to be applied to make payments under the Plan. Nor has the Debtor demonstrated that there is a reasonable likelihood it will be able to make all plan payments. Debtor's Projections have no basis given Debtor's actual performance during this case. Accordingly, the Court denies confirmation of the Plan.

### Dismissal or Conversion to Chapter 7

Having denied confirmation, the Court considers the Motion to Convert. Under § 1112(b), the court must dismiss or convert a chapter 11 case to chapter 7, whichever is in the best interests of creditors and the estate, for cause. 11 U.S.C. § 1112(b). Section 1112(b)(4) provides a nonexhaustive list of grounds that may constitute "cause" for dismissal or conversion, which includes gross mismanagement of the estate and failure to comply with a court order. 11 U.S.C. § 1112(b); *In re Mulholland*, No. 3:18-bk-4096, 2022 WL 145151, * 3 (Bankr. M.D. Fla. Jan. 14, 2022). Other grounds of cause include a debtor's lack of good faith. *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984). Determining whether cause exists is "subject to judicial discretion under the circumstances of each case." *Albany Partners* 749 F.2d at 674.

If cause exists, debtor or any other party in interest may avoid mandatory dismissal or conversion by establishing the "unusual circumstances" exception under § 1112(b)(2). *In re*

*Schultz*, 436 B.R. 170, 174-75 (Bankr. M.D. Fla. 2010). For the exception to apply, "the bankruptcy court must find and specifically identify unusual circumstances establishing that converting the case is not in the best interests of the creditors and estate" and the debtor or party in interest must establish "(1) there is a reasonable likelihood that a plan will be confirmed within a reasonable period of time; (2) the grounds for converting the case do not include a substantial or continuing loss to or diminution of the estate; and (3) there exists a reasonable justification for the act or omission creating the grounds for converting the case that can be cured within a reasonable period of time." *In re Bruno One, Inc.*, 619 B.R. 503, 509 (M.D. Fla. 2020).

Here, the Court finds cause exists under § 1112(b). As discussed, Debtor's actions demonstrate a lack of good faith. Debtor has likewise engaged in gross mismanagement of the estate by providing gratis services to family members, not pursuing claims against insiders and by misleading the UST about access to QuickBooks and requested financial records. Nor did Debtor timely pay subchapter V trustee fees as directed in the SubV Order.[40] For all these reasons, the Court finds cause exists and considering the best interests of creditors and the estate, the Court finds this case should be converted to chapter 7.

Conversion to chapter 7 is in the best interests of all creditors. Conversion allows a chapter 7 trustee to pursue claims against insiders and provide an orderly distribution to creditors. Conversion will avoid a "rush" to the courthouse by Homeowners (represented by counsel) that would likely leave little or nothing for other non-represented Homeowners. Conversion also allows a chapter 7 trustee to gain immediate access to bank accounts and other assets that could dissipate upon dismissal. Although Debtor argues that unusual circumstances exist, they do not. The Court did not

---

[40] *See* Doc. Nos 11, 152, 191. Debtor did not dispute that subchapter V trustee fees had not been timely paid. The Sub V Order directs Debtor within 30 days of the petition date and continuing monthly thereafter to remit to the subchapter V trustee interim compensation of $1,000. Debtor did not comply until February 21, 2023—days before the confirmation hearing—by paying the subchapter V trustee $5,000.

find credible Debtor's justifications for its actions throughout this case. Actually, the Court did not find credible Debtor's primary witness—Mr. Black—credible at all throughout the evidentiary hearing. For this and the reasons previously stated at the evidentiary hearing on March 1, 2023, the Court will not confirm the Plan and convert this case to chapter 7.

###

The Clerk is directed to serve a copy of this Order on all interested parties.